# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| Jeffrey Joseph Dantzer, | : | Case No. 3:09CV2198 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*.  Pending are the parties' briefs on the merits and Plaintiff's Response (Docket Nos. 17, 20 and 23).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

## I. PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI  on December 17, 2004 alleging that his disability began on December 26, 2002 (Tr. 62-64, 694-695).  Plaintiff's request for DIB benefits was denied initially and upon reconsideration (Tr. 52-55; 47-49).  His request for SSI benefits was denied initially and upon reconsideration (Tr. 685-687; 689-691). On March 26, 2008, Plaintiff, represented by counsel, and Vocational Expert (VE) Amy Kutschbach appeared and testified at an administrative hearing (Tr. 752).  The ALJ rendered an unfavorable decision on June 30, 2008 (Tr. 19-33).  The Appeals Council

denied Plaintiff's request for review on July 25, 2009 (Tr. 6-8).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II. JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III. FACTUAL BACKGROUND

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff testified that he was 47 years of age,  5'10 tall and  weighed 210 pounds.  He resided with  a  friend  who  was  employed  at  General  Motors.   In 2006 Plaintiff began receiving worker compensation benefits (Tr. 757, 758, 759, 765-767).

Although he completed the twelfth grade, Plaintiff described himself as functionally illiterate, unable to read and write (Tr. 760, 789).  After failing the original driver's test twice, Plaintiff passed a special test and was able to obtain his driver's license (Tr. 760).

Plaintiff was last employed was in May/June 2004.  For two months, Plaintiff was "doing the orders or pulling cakes" for Wonder Bread (Tr. 762, 763).  He quit as he could not manipulate the huge racks that housed the cakes (Tr. 763).

Previously, Plaintiff was employed as a janitor/custodian at I. B. Steel.  After a year, he was promoted to a machine helper.  He worked in that capacity for seventeen years (Tr. 764).  The plant closed in December 2002, and the following year Plaintiff received a severance package totaling $6,067 (Tr. 765).

The ALJ described Plaintiff's medical history to include a series of carpal tunnel releases, a right ulnar nerve transposition, left foot surgeries, and continuing treatment for neck, back and both shoulders

2

and arms.  Plaintiff also reported a skin disorder characterized by chronic inflammation, pain,  itching and scratching which limited his ability to sit (Tr. 768, 796-797).  Plaintiff's most pronounced problem was his constant back pain.  He described the back pain as sharp, stabbing and burning.  On an ascending scale of one to ten with ten representing the most severe pain, Plaintiff described his daily back pain level at five to six with occasional higher pain levels (Tr. 769, 797).

Plaintiff's neck pain was sharp, burning and stabbing, often radiating into his shoulders (Tr. 774).  He described his daily neck and shoulder pain at a level five to six (Tr. 775).

Plaintiff also reported pain in his hands that resembled burning and stabbing.  Often, Plaintiff was unable to grip with his hand.  Occasionally, Plaintiff's fingers were numb and he would lose the sense of touch.  He experienced significant burning in the elbows (Tr. 775-776, 781).

Plaintiff also reported symptoms of a mood disorder.  He was pursuing treatment at Unison, a mental health behavioral group (Tr. 782).   The persistent skin disorder affecting his anus caused him to feel depressed (Tr. 797).

Plaintiff complained of significant swelling in his feet and trouble with his legs (Tr. 777).  The problems with his feet began when an object weighing  "little over 1,000 pounds, maybe a little less than 2,000 pounds rolled over my left foot" (Tr. 800).

Plaintiff reported that he had tried several pain medications including Vicodin, a pain patch, Motrin 800 and Lyrica®, a neuropathic pain medication (Tr. 770-771, 796).  In addition, hi treating physicians prescribed medication to treat depression (Tr. 785).

Plaintiff's physician was attempting to wean him off the pain medications that were potentially addictive (Tr. 771).  As a result, a pain management specialist administered a series of injections for back pain. The relief provided by these injections was temporary. When the Ohio Bureau of Workers's

3

Compensation approved and paid for the shots, Plaintiff would undergo the series of injections (Tr. 772, 778).

Plaintiff estimated that he could walk from 30 to 45 minutes before he would have to sit to relieve back and foot pain (Tr. 779). He could stand in one place without changing positions for 20 minutes. Although Plaintiff was given a cane during his course of physical therapies, he did not use an assistive device for walking or standing (Tr. 779-780). He testified that he could sit for twenty to forty minutes before having to get up, stand or walk (Tr. 786). Plaintiff could not walk up stairs without the assistance of a rail (Tr. 782). Plaintiff claimed that he was capable of managing his hygiene although he had difficulty bending to wash his lower extremities. He could dress himself despite having difficulty buttoning his clothing and putting on his shoes and socks (Tr. 781, 791).

During a typical day, Plaintiff ate breakfast, took care of his dogs and watched television. He had lunch with his roommate before she left for work. He slept during the afternoon and/or watched television. Consequently, Plaintiff had bouts of insomnia at night. Plaintiff estimated that he visited his mother a couple of times weekly. Occasionally, he called his daughters and "dropped in" to visit her (Tr. 787-790, 792). When his daughters visited at him, Plaintiff enjoyed talking with them or watching a video (Tr. 791). Plaintiff did no cooking, sweeping, vacuuming or dusting. Occasionally, Plaintiff mopped the kitchen floor and loaded the dishwasher (Tr. 792, 793). He seldom shopped for groceries but he did put his laundry "away" and maintain the lawn (Tr. 792, 793). Plaintiff had a car that was inoperable and unlicensed (Tr. 794). Plaintiff had not participated in either of his hobbies–pool and fishing– for the past couple of years (Tr. 795).

**B.    VE TESTIMONY.**

The VE initially added to Plaintiff's past relevant work history, a job of industrial cleaner, a job

4

performed with a specific vocational preparation (SVP) of two, which suggests that a typical worker would learn to develop the work skills during anytime beyond a short demonstration up to and including one month.  The work was considered a medium physical demand level (PDL) (Tr. 802).  The VE also added a machine helper or general laborer which had a SVP of three and a heavy PDL (Tr. 802-803).  Although Plaintiff only performed these jobs for short periods of time, both of these jobs have transferable skills, including use of tools, equipment, operation and material handling (Tr. 803).

Assuming a person of Plaintiff's age, education and work history, who could perform light work, sit, stand, walk six hours each out of eight hours in a workday, lift, carry, push, pull twenty pounds occasionally and ten pounds frequently with limitations on his or her ability to climb ramps, stairs, balance or kneel, he or she could no longer perform work as an industrial cleaner or machine operator (Tr. 804-805).  The cake puller job, however, would still be a viable option for an individual with these limitations.  Additionally,  the hypothetical individual could perform work as a wire cutter, stock  checker and cafeteria attendant (Tr. 805, 806).

From the Department of Labor's fourth quarter reports for 2007, there were between 100 and 150 wire cutter jobs in the region and approximately 1,000 in the state.  With respect to the stock checker job, there were between 400 and 458 in the region and approximately 9,000 in the state.  The cafeteria attendant job position numbered between 200 and 250 in the region and approximately 15,000 in the state.  All three positions, as dictated in DOT, would require anything beyond a short demonstration up to and including one month of specific vocational preparation and would be performed at the light exertional level.  The wire cutter, stock checker and cafeteria attendant would accommodate a sit and/or stand option.  The cake puller would not accommodate a sit and/or stand option and would therefor be eliminated (Tr. 806, 819).

5

If the limitations in the hypothetical, including the sit and/or stand option, were reduced to sedentary work, the past work would be eliminated but Plaintiff could perform work as a sorter, spotter and surveillance system monitor. Between 100 and 150 sorter positions exist in the region and approximately 3,000 at the state level. About 100 to 150 spotter positions exist in the region and approximately 2,500 at the state level. Between 200 and 250 surveillance system monitor positions exist in the region and 2,000 at the state level (Tr. 807).

If the hypothetical plaintiff had to stand/walk two out of eight hours, sit only four of the eight hours, lift/carry ten pounds occasionally and five pounds frequently, stand/walk only two hours, and sit only four hours, he or she would be reduced to less than full-time work and less than sedentary physical demand work (Tr. 807). The jobs of wire cutter, stock checker and cafeteria attendant required frequent handling and various states of fingering (Tr. 811). The cafeteria attendant would be the only job that had a direct occasional or brief interaction with others. The stock checker would be in an environment with people and the surveillance system monitor job would have limited exposure to people. If the hypothetical person could not maintain tasks or production for two thirds of the day or deal with the public, then the cafeteria attendant position would be eliminated (Tr. 816).

### SUMMARY OF MEDICAL EVIDENCE

On January 8, 1995, Plaintiff was diagnosed with bronchitis and inflammation of the lining of lungs and chest (Tr. 211). X-rays of Plaintiff's heart and lungs showed a normal heart size and pulmonary vasculature was within normal limits (Tr. 212).

Plaintiff was struck in the head by an unidentified object on October 22, 1995. Plaintiff was treated at Toledo Hospital for left elbow and left thigh contusions. His wounds were closed and Tylenol #3 was prescribed for discomfort (Tr. 205-208).

6

X-rays of Plaintiff's right elbow conducted on June 23, 1995 showed no evidence of bone tissue injury or arthritic change (Tr. 210).

Plaintiff sustained an industrial injury on June 30, 1995 (Tr. 660). The electromyogram(EMG)-nerve conduction (NC) study administered on June 30, 1995 showed evidence of bilateral carpal tunnel syndrome (Tr. 209).

While moving a box on January 10, 1996, Plaintiff cut his face. At Toledo Hospital, the wound was shaved and adhesive strips were applied to close the wound (Tr. 203).

On January 30, 1996, Plaintiff presented to the Toledo Hospital with severe abdominal pain. He was discharged on February 6, 1996, after being diagnosed with and treated for gastroenteritis with a rotavirus (Tr. 136-175).

Plaintiff presented to the Toledo Hospital on July 2, 1996, for treatment of a severe headache of unknown etiology. Dr. Recto Natividad, M. D., diagnosed Plaintiff with headaches of uncertain etiology, possibly the by-product of a viral syndrome (Tr. 176-191).

Plaintiff was treated at Toledo Hospital for abdominal pain of unknown etiology on January 6, 1997 (Tr. 197). The results from the diagnostic imaging of Plaintiff's kidneys, ureters, urinary tract and bladder were all within normal limits (Tr. 198, 199). The results from the intravenous pyelogram administered on January 7, 1997, were also within normal limits (Tr. 199).

Dr. Gregory Thomas, M. D, determined that the EMG-NC study administered on June 11, 1997, was consistent with left carpal tunnel syndrome with no permanent additional nerve damage (Tr. 192).

Plaintiff's left foot was injured when a heavy roll of steel wire rolled across it. The diagnostic imaging of his foot showed evidence of a ganglion (Tr. 650). Dr. Dennis R. Assemacher, M. D., excised

7

a ganglion cyst from Plaintiff's left foot on January 7, 1999 (Tr. 290).

Although the Phalen's test, an examination used to diagnose carpal tunnel syndrome, was negative, Dr. A. Mutgi confirmed on February 11, 1999, the presence of bilateral carpal tunnel syndrome secondary to repetitive stress (Tr. 666).

On April 1, 1999, the nerve conduction study results were normal except for prolonged latency of the medial sensory and motor distal latencies bilaterally (Tr. 288).

In December 1999, Dr. Jeffrey F. Wirebaugh, M. D., confirmed through an examination that Plaintiff's right hand/forearm was positive for Phalens, a diagnostic test designed to detect carpal tunnel syndrome and Tinels, a percussing test to detect irritated nerves. Plaintiff's left hand was positive for Phalens (Tr. 660).

On January 21, 2000, the EMG results were  positive for bilateral carpal tunnel syndrome (Tr. 659). Dr. Assemacher performed a release of the left wrist on January 31, 2000 (Tr. 286). Five weeks after the release, Plaintiff's fingers felt stiff and swollen. He could not flex his fingers into his palm (Tr. 654). Dr. Assenmacher issued a certificate of disability on February 15, 2000, in which he declared that Plaintiff was unable to perform his regular duties from February 15 to March 26, 2000 (Tr. 657).

On July 10, 2000, Dr. Mark W. Cooper, determined that under American Medical Association Guidelines, Fourth Edition, the whole person impairment was 2% (Tr. 651). On January 8, 2001, Dr. Wirebaugh opined that Plaintiff had 10% permanent partial impairment of the whole person (Tr. 649).

Plaintiff was admitted to St. Charles Mercy Hospital for treatment of severe epigastric abdominal pain of uncertain etiology on February 11, 2002. There was no evidence of ulcers, gastritis or cholecystitis. There was a small protrusion of the abdominal cavity (Tr. 213, 222). Results from the double contrast barium swallow and upper gastrointestinal series were normal (Tr. 224). Plaintiff was

discharged on February 14, 2002.

Plaintiff was re-admitted to St. Charles on February 19, 2002, for recurrent severe abdominal pain and discomfort (Tr. 232).  Plaintiff underwent an esophagogastroduodenoscopy, the results of which showed a normal esophagus and stomach cavity (Tr. 236).  There was no evidence of cholecystitis (Tr. 238).  Plaintiff's lumbar spine showed no evidence of disc herniation, stenosis or neural compromise (Tr. 240).

Dr. Assemacher performed a release of the right carpal ligament on July 11, 2002 (Tr. 254). Two weeks post-release, Plaintiff was experiencing mild pain (Tr. 644).

On September 11, 2002, Dr. Samuel M. Park, determined that there was electrodiagnositic evidence of a mild left focal median mononeuropathy at the wrist that was consistent with mild carpal tunnel syndrome (Tr. 277).

Dr. Assemacher excised tissue mass from Plaintiff's left foot on October 7, 2002 (Tr. 273).  On October 17, 2002, Dr. Assemacher prescribed a right wrist splint (Tr. 621).  In November 2002, Dr. Assemacher noted that Plaintiff's status post right carpal tunnel had poor results.  Plaintiff continued to have pain and his hand was numb (Tr. 619).  On December 5, 2002, Dr. Assemacher reported that Plainitff continued to have tenderness and weakness in his right wrist (Tr. 615).

Dr. David E. Symanski, a neurologist, determined on December 12, 2002, that Plaintiff's right-sided carpal tunnel syndrome affected mainly muscles or nerves that affected or produced motion and there was moderate to marked right ulnar entrapment at the elbow (Tr. 612).

Dr. Nagaraja Oruganti, M. D., performed a colonoscopy on January 14, 2003,a and discovered a small sessile, nonbleeding polyp in the sigmoid colon and excised it.  Additionally, Dr. Oruganti found a small diverticula present in the sigmoid colon and internal hemorrhoids (Tr. 354, 356).

9

On January 28, 2003, Plaintiff reported to Dr. Assemacher that he had returned to work; however, while working both arms became numb and achy. Dr. Assemacher attributed this to ulnar nerve palsy in the right elbow and recurrent right carpal tunnel syndrome both to secondary repetitive stress and machine vibration (Tr. 613). On March 3, 2003, Dr. Assemacher performed another release of the right wrist and transposition of the right ulnar nerve Tr. 266).

On March 5, 2003, Plaintiff was admitted to St. Charles Hospital for pain control (Tr. 265). On May 27, 2003, Plaintiff reported that his right carpal tunnel release and transposition of the ulnar nerve were improved (Tr. 605). On July 15, 2003, Plaintiff opined that the surgery was not effective. He continued to have tingling in his right hand. His right arm was more painful than his left (Tr. 262).

Dr. Szymanski reported on August 5, 2003, that there was definite improvement in the right-sided carpal tunnel syndrome but moderate to marked left sided carpal tunnel syndrome affecting both motor and sensory fibers. Plaintiff was free of any evidence of ulnar entrapment (Tr. 443). On September 4 2003, Plaintiff advised Dr. Assemacher that he felt a cramping sensation in his right hand but the numbness decreased in severity (Tr. 261).

Plaintiff, treated by Dr. Mahmood Darr on January 8, 2004, was diagnosed with bilateral carpal tunnel syndrome (Tr. 598). In February 2004, Dr. Darr administered a cortisone injection and Plaintiff noticed an improvement of his symptoms (Tr. 597). In December 2004, Dr. Darr noted that Plaintiff was not taking the medication designed to relieve nerve pain (Tr. 429).

On April 6, 2004, Dr. Harvey A. Popovich, M.D., a board certified occupational and environmental medicine examiner, opined that Plaintiff had reached maximum medical improvement and he was not amenable to further medical, surgical or rehabilitative procedures. It was also his opinion that Plaintiff had functional limitations due to his physical limitations (Tr. 595).

10

On September 24, 2004, Dr. Mark G. Loomus, a board certified neurologist, ruled out cervical radiculopathy based on a review of Plaintiff's medical records.

Plaintiff was admitted to the Toledo Hospital for low back pain on January 8, 2005.  He was diagnosed with acute low back strain, bilateral wrist sprains, acute cervical spine strain and an elbow contusion (Tr. 298-303).

The medical record provided indicates that Plaintiff treated with Dr. Darr for several conditions, including but not limited to severe back pain, neck pain, polyuria, diverticulitis and a skin disorder.  Dr. Darr prescribed a myriad of drug therapies and eventually referred Plaintiff to the College of Medicine at the University of Toledo for alternative therapies (Tr. 385-397, 406).

The computerized brain scan administered on January 25, 2005, showed no evidence of intracranial hemorrhage or mass lesion.  Further, there was no suggestion of a stroke (Tr. 425).  The results from the magnetic resonance imaging (MRI) scan of the brain were within the normal range (Tr. 422).  The findings from the MRI of the right shoulder were consistent with impingement syndrome (Tr. 421).

On March 4, 2005, Dr. Darr summarized Plaintiff's impairments as multilevel degenerative disc disease with diffuse disc bulging, spinal canal stenosis at L2-3 and L3-4, mild tendinopathy the supraspinatus muscle and degenerative changes at the acromioclavicular joint (Tr. 420).  On the same date, Dr. Darr described for the Ohio Department of Job and Family Services Plaintiff's condition as back pain, shoulder pain and a skin disorder characterized by chronic itching and scratching.  In assessing Plaintiff's functional capacity, Dr. Darr determined that Plaintiff could stand and/or walk for two hours and sit for four hours.  Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods and to complete a normal workday.  Expecting Plaintiff's

11

impairments to last for more than twelve months, Dr. Darr opined that Plaintiff was unemployable (Tr. 412-415).

On March 22, 2005, a state agency physician, Dr. William D. Padamadan, conducted a clinical evaluation. He diagnosed Plaintiff with bilateral carpal tunnel syndrome repair scars, right ulnar nerve repositioning, low back pain and bilateral shoulder pain (Tr. 304-307). The range of motion in Plaintiff's cervical spine, shoulders, elbows, wrists, hips, ankles and hands-fingers was normal. The range of motion in Plaintiff's dorsolumbar spine and knees were abnormal (Tr. 308-311).

Dr. T. Kumaran, M. D., conducted a stress test on April 21, 2005. The results did not show arrhythmias or other symptoms (Tr. 407). No electrocardiography changes suggested ischemia (Tr. 407). However, there was evidence of mild infero-based ischemia in a small area (Tr. 409). Mild aortic regurgitation with thickened aortic leaflet and mildly severe motion abnormality in the inferior wall of mild severity was present (Tr. 410).

At the Toledo Clinic, Plaintiff consulted with Dr. Brian F. Hoeflinger, M. D., to resolve the chronic occurrence of hip pain. Upon review of the radiographic imaging results, Dr. Hoeflinger was convinced that surgery was not of any benefit but Plaintiff should consider other measures including nonsteroidal medications, physical therapy and chiropractic therapy, back bracing and pain management (Tr. 403).

On March 31, 2005, Dr. David E. Szymanski, a neurologist, found that Plaintiff's carpal tunnel syndrome moderately affected sensory fibers. No ulnar entrapment was present (Tr. 584).

On May 9, 2005, the catheterization of Plaintiff's left heart showed a nonspecific abnormal function study of the cardiovascular system (Tr. 313-327). There was no evidence of significant coronary artery disease (Tr. 400). On May 31, 2005, Plaintiff was treated for neck and back pain at the

12

Medical College of Ohio Hospital (Tr. 328). He was diagnosed with minimal lumbar spine spondylosis and mild to moderate degree of cervical spondylosis at C5-6 (Tr. 330).

The X-ray of Plaintiff's lumbar and cervical spines administered on May 31, 2005, showed no evidence of acute bony abnormality but minimal lumbar spondylosis (Tr. 397). Dr. Martin C. Skie, M.D. conducted a focused examination of Plainitff's bilateral upper extremities. He found bilateral upper extremity cervical radiculopathy and spinal stenosis as well as bilateral shoulder impingement (Tr. 398).

On July 11, 2005, Dr. Elizabeth Das performed a physical residual functional capacity (RFC) assessment and opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours, sit about six hours and engage in unlimited pushing/pulling (Tr. 377). Plaintiff could never climb using ladders/ropes/scaffolds and he was limited in his ability to reach in all directions or engage in gross or find manipulation (Tr. 378, 379).

Plaintiff presented to Dr. Sudhakar N. Pangulur, M.D., on October 17, 2005, complaining of lower gastrointestinal bleeding and bloody stools (Tr. 353). Dr. Pangular conducted an upper gastrointestinal examination on October 19, 2005, and found air bubbles. Esophageal polyps could not be excluded as a possible diagnosis (Tr. 345). However, no gastric or duodenal abnormalities were visualized (Tr. 350). Dr. Pangulur's attempts to perform a colonoscopy and biopsy on October 26, 2005, were met with opposition because of the intense pain. There was no sign of diverticulitis in the area that Dr. Pangular could see (Tr. 343).

Plaintiff was examined by Richard N. Davis, a clinical psychologist, for the Bureau of Disability Determination on November 30, 2005 (Tr. 331). Mr. Davis diagnosed Plaintiff with an adjustment disorder, lower borderline intellectual functioning capacities, psychosocial stressors, illiteracy and

13

moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 334).

On December 7, 2005, Dr. Pangular performed a diagnostic procedure that visualizes the esophagus, stomach and duodenum.  No abnormalities were seen (Tr. 337).

On January 18, 2006, Dr. Kristen E. Haskins, Psy.D., conducted a mental RFC assessment.  She found that Plaintiff had no marked limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  She did find that Plaintiff had moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal work week, interact appropriately with the general public, accept instructions and respond appropriately, get along well with co-workers, maintain socially appropriate behavior and respond appropriately to changes in the work setting (Tr. 358-359).

Dr. Haskins conducted a psychiatric review for the period of December 26, 2002, through January 18, 2006.  She found that Plaintiff had an adjustment disorder with mixed disturbance of emotions and conduct and borderline intellectual functioning (Tr. 365-366).  It was her opinion that Plaintiff was mildly restricted in his ability to engage in activities of daily living, moderately restricted in his ability to functional socially and moderately restricted in his ability to maintain concentration, persistence and pace (Tr. 372).

Dr. Ashok Salvi administered epidural steroid injections on February 3and February 17, 2006 (Tr. 567, 564).  Dr. Salvi administered a left sided diagnostic medial branch block on March 17, 2006 (Tr. 501).

Dr. Martin C. Skie, on May 9, 2006,  incorporated a plan for Plaintiff to participate in physical therapy as treatment for his right upper extremity (Tr. 569).

14

Plaintiff reported to Dr. Darr on November 16, 2006, that physical therapy was not beneficial. Rather a pain medication was prescribed (Tr. 558).

On January 11, 2007, Dr. Darr determined that Plaintiff had an irritable bowel with chronic bipolar and chronic cervical pain.  He noted that Plaintiff suffered from gastroesophageal reflux disease (Tr. 508).

On January 23, 2007, Marsha Elliott of Unison assessed Plaintiff for "re-admission" into the program.  She diagnosed Plaintiff with a depressive disorder, not otherwise specified, emotional problems, economic problems and serious symptoms or any serious impairment in social, occupational, or school functioning. There were no identified changes in Plaintiff's condition as of his final appointment on March 27, 2007 (Tr. 446-457).

Dr. Skie injected steroids into the situs of Plaintiff's carpal tunnel on January 30 and February 1, 2007 (Tr. 505, 557).

Dr. Azedine Medhkour, M. D., conducted an MRI of Plaintiff's spine and the results showed moderate cervical spondylosis with loss of disc space and spondylotic disc bulges at multiple levels (Tr. 504).

Dr. Darr opined that Plaintiff's chronic back pain was markedly relieved with the Lidoderm patch so he doubled the dosage on March 15, 2007 (Tr. 553).

On March 20, 2007, Dr. Ashok Biyani diagnosed Plaintiff with degenerative spondylosis of the cervical spine (Tr. 552).  Also, on this date, Dr. Szymanski administered an electromyography (EMG). He noted no current evidence of cervical radiculopathy and that Plaintiff's carpal tunnel syndrome had improved since his last EMG in 2005 (Tr. 500).

Dr. Skie administered a steroid injection on April 18, 2007 (Tr. 498).

15

On April 25, 2007, Plaintiff commenced participation in individual counseling at Unison with the goal of stabilizing mood and depression (Tr. 684). Plaintiff cancelled or failed to attend several sessions and the sessions were terminated on March 17, 2008 (Tr. 678).

Plaintiff was prescribed Lyrica® to treat chronic back pain on June 29, 2007 (Tr. 544).

On July 12, 2007, Dr. Frederick J. Shiple, an orthopedic surgeon, reviewed Plaintiff's medical records and concluded that there was no evidence of spinal stenosis and there was no support in the medical records for the additional allowance of bilateral shoulder impingement (Tr. 543).

Plaintiff was treated for a right hamstring sprain on September 12, 2007 (Tr. 527).

Dr. Salvi injected a steroid in Plaintiff's back at C6-C7 interspace on September 17, 2007 (Tr. 494).

Dr. Sukhjit Purewal, an orthopedic specialist, reviewed Plaintiff's records and on September 19, 2007, opined that Plaintiff had not reached maximum medication improvmeent pending completion of the series of epidural steroid injections and possibly medial branch blocks (Tr. 523).

Dr. Salvi injected a steroid at C-6, C-4 and C-3 levels on October 8, 2007. He repeated the same procedure on October 22, 2007 but redirected the injections to C-4, C-3 and C-6 (Tr. 491).

Dr. Salvi performed a medial branch block on October 22, 2007 (Tr. 517).

Plaintiff was treated for non-specific abdominal pain on November 20, 2007.

Plaintiff was treated on an emergency basis for non-specific abdominal pain on November 21, 2007. During his hospital stay, it was discovered that his gallbladder was normal. Ultimately, Plaintiff was diagnosed with diverticulosis of the distal descending and sigmoid colon (Tr. 471, 675).

Plaintiff was prescribed an antibiotic for the inflammation of his pancreas on November 25, 2007

16

(Tr. 509).

Dr. Stephan F. Kiechel, an orthopedist, opined on February 27, 2008, that Plaintiff had not reached his maximum medical improvement.  He suggested that Plaintiff work with Dr. Skie in determining what long term medication such as Darvocet, Vicodin, Lyrica and the patches would provide.  He recommended that the intermittent facet joint injections in the neck were helpful as part of the maintenance program (Tr. 515).

**STANDARD OF DISABILITY**

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a

17

finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings of fact after the hearing on remand:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2009.

2.  Plaintiff had not engaged in substantial gainful activity since December 26, 2002, the alleged onset date of his disability.  Plaintiff had severe impairments including a history or bilateral carpal tunnel syndrome, status post release surgeries and right elbow ulnar nerve palsy, status post transposition repair surgery, bilateral arm, neck, and low back pain with cervical and lumbar spine spondylosis/degenerative disc disease and bilateral shoulder degenerative joint disease/impingement syndrome and adjustment/depressive disorder, borderline intellectual functioning and low reading skills.  Plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C. F. R Part 404, Subpart P, Appendix 1.

3.  Plaintiff had the RFC to perform light work reduced as follows:  a sit/stand option where the individual can occasionally change positions throughout the work day, but can remain attentive to the task at hand, frequent climbing of ramps and stairs, balancing and kneeling, occasional stooping and crouching, never climbing ladders, ropes or scaffolds, occasionally reaching overhead, only frequently handling and fingering with the bilateral upper extremities, no work involving exposure to temperature extremes, humidity and cold and hot substances, limited to simple, repetitive, routine tasks with only few, if any, changes in the workplace setting, no fast paced or strict production requirements; only brief and occasional interactions with others and no jobs where reading is essential.

4.  Statements concerning the intensity, persistence and limiting effects of Plaintiff's symptoms are not entirely consistent with or fully supported by the medical or other evidence in record or by his course of conduct.

5.  Plaintiff was unable to perform any past relevant work.

6.  Plaintiff was a younger individual aged 18 to 49 on the alleged disability date, has at least a high school education and was able to communicate in English.

7.  Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

8.  Plaintiff has not been under a disability as defined under Act from December 26, 2002 through June 30, 2008.

(Tr. 19-33).

## STANDARD OF REVIEW

The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)).  In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence.  *Id.* (*citing* 42 U.S.C. § 405(g )).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely

19

because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6ᵗʰ Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6ᵗʰ Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6ᵗʰ Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6ᵗʰ Cir. 1984)).

### PLAINTIFF'S POSITIONS.

The Magistrate construes Plaintiff's claims as follows:

1.  The ALJ failed to ask at the hearing if the VE's testimony was consistent with SSR 00-4p, TITLES II AND XVI: USE OF A VE AND VOCATIONAL SPECIALISTS EVIDENCE AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS.

2.  The ALJ relied on Plaintiff's formal completion of years in school not his borderline intellectual functioning (BIF).  The ALJ should have obtained further testimony/testing to assess whether he was illiterate.

3.  Plaintiff does not have the ability to read 95 to 120 words per minutes, reason at level two or read at level one; consequently, he cannot perform the jobs recommended by the VE.

4.  The hypothetical question posed to the VE did not account for:  (a) moderate difficulties maintaining social functioning, (b) attention and concentration deficits, (c) inability to deal with high volumes of stress, (e) his inability to use his hands for prolonged periods or (f) bipolar disorder.

5   Dr. Darr's opinions are entitled to controlling weight.

6.  The ALJ erred in using Plaintiff's age on the date he became disabled.
    .

20

**DEFENDANT'S POSITIONS**

Defendant contends that the ALJ's mental residual findings were supported by substantial evidence.  Further, the ALJ's physical RFC findings were supported by substantial evidence.  Th ALJ appropriately relied on the testimony of the VE in determining whether Plaintiff could perform a significant number of jobs at Step Five of the sequential evaluation.

**Discussion**

**1.      SSR 00-4P.**

Plaintiff contends that the VE was not asked during the hearing if her testimony was consistent with the provisions of SSR 00-4p.

Under SSR 00-4p, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination or decision about whether the claimant is disabled.  SSR 00-4p, at *2.  At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.  SSR 00-4p, at *2.

With the exception of a sit and stand option, the VE responded affirmatively to the ALJ's inquiry that there was no possible conflict between the evidence offered and the information provided in the DOT (Tr. 808).  Nothing in this regulation required the ALJ to conduct further investigation into the accuracy or reliability of such testimony once the VE claimed that no conflict existed.  Plaintiff was afforded a full opportunity to cross-examine the VE.  In fact, on cross-examination the VE reiterated that she relied upon DOT's definitions in defining terms indigenous to social security law.  Plaintiff's

21

counsel thoroughly cross-examined the VE about the basis of her opinions but did not challenge those opinions or the correlation of her opinions with any inconsistency in DOT.  Even if the VE's testimony were in conflict with the DOT, counsel failed to point out any conflict with the DOT or raise an issue pertaining to the VE's testimony rising outside the scope of the DOT.  Failure to challenge the basis of the VE's testimony at the administrative hearing constitutes a waiver of the issue in the district court. *Rosic v. Commissioner of Social Security,* 2010 WL 3292964, *11 ( N. D. Ohio 2010) (*see also Ragsdale v. Shalala*, 53 F. 3d 816, 819 (7th Cir. 1995)).

2.      BORDERLINE INTELLECTUAL FUNCTIONING.

Plaintiff makes an impassioned argument that because he is plagued with borderline intellectual functioning and that he is illiterate.  The ALJ should have requested further testing to confirm that his low intellectual functioning is a byproduct of illiteracy.

Illiteracy means the **inability** to read or write.  20 C. F. R. §§ 404.1564(b) (1) and 416.964(b) (1) (Thomson Reuters 2010).  It is not measured by connecting a claimant's abilities to cognitive deficits.  A person is illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  20 C. F. R. §§ 404.1564(b) and 416.964(b) (Thomson Reuters 2010).  Generally, an illiterate person has had little or no formal schooling.  20 C. F. R. §§ 404.1564(b) and 416.964(b) (Thomson Reuters 2010).  Being illiterate *per se* does not qualify a claimant as per se disabled.  *Skinner v. Secretary of Health and Human Services,* 902 F. 2d 447 (6th Cir. 1990).  Depending on the claimant's age, other impairments and past work experience, illiteracy may render a claimant disabled.  20 C. F. R.  Pt. 404, Subpt. P, App. 2 (Thomson Reuters 2010).  The numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist.  *Id.* at 450-451.

The ALJ concurs that Plaintiff satisfies the diagnostic description of borderline intellectual functioning.  However, Plaintiff has not submitted any diagnosis or opinion from a medical professional stating that he is illiterate.  The only direct evidence of the level of Plaintiff's literacy is his testimony and the opinion of clinical psychologist Richard Davis.  Mr. Davis claimed that Plaintiff could neither read nor write (Tr. 334).  However, during the initial interview at the field office, Plaintiff, a high school graduate, exhibited no difficulties with reading (Tr. 68).  Although his mother or girlfriend helped him complete the Social Security application forms, Plaintiff admitted in the forms that he could speak and understand English, he could read and understand English and he could write more than his name in English (Tr. 70, 761).  The ALJ noted that at the hearing, Plaintiff responded to his questions in a cogent and comprehensive manner even though he admitted that he was not a "good reader" and he could only write a couple of things but no big words (Tr. 31, 761).  A special test was administered to facilitate Plaintiff's passing the driver's license test (Tr. 760).

The ALJ gave reasons for finding that Plaintiff is not illiterate.  He considered Plaintiff's admissions in the disability report and his testimony.  Having acknowledged Mr. Davis' finding that Plaintiff was plagued with borderline intellectual functioning, the ALJ found the claims of illiteracy not supported by diagnostic evidence.  The ALJ did consider that Plaintiff had the **ability** to read, albeit not well, but he was not illiterate.

The VE explained that only the slightest ability to read would allow Plaintiff to perform the jobs identified.  Even if Plaintiff's deficiencies in reading and writing were applied to the Medical Vocational Guidelines as a framework for determining disability, a factor of illiteracy balanced against an individual of Plaintiff's age and previous work experience renders a finding of not disabled under sedentary, light and medium exertional levels.  20 C. F. R. § Pt.404, Subpt. P, App. 2 (Thomson Reuters

23

2010).   Such characterization of illiteracy is not determinative of disability under the Medical

Vocational Guidelines.

Since the ALJ explained the basis for his decision and that decision is supported by substantial

evidence in the record, the Court cannot disturb his finding that Plaintiff was not illiterate as defined

under the Act.

**3.      READING AND REASONING ABILITIES**

The VE testified that Plaintiff could perform work as a wire cutter and cafeteria attendant.  Both

jobs require Plaintiff to read at "level one" and reason at a "level two".  Because he considers himself

illiterate, Plaintiff argues that these jobs extend beyond his capabilities.

In DOT jobs are classified by selected characteristics and auxiliary profile data that embraces

aspects of education that are required for a worker to perform satisfactorily.  DOT, 1991 WL 688702,

4th ed. rev. 1991 (Thomson Reuters 2010).  Level one of the language component, the lowest level used

in DOT, requires the claimant to recognize the meaning of 2,500 (two- or three-syllable) words, read

at a rate of 95-120 words per minute and compare similarities and differences between words and

between series of numbers.  1991 WL 688702.  Reasoning development at level two suggests the

application of commonsense understanding to carry out detailed but uninvolved written or oral

instructions and dealing with problems involving few concrete variables in or from standardized

situations.  These requirements are commensurate with a limitation to simple, repetitive tasks.

Obviously the basic language requirements would be impossible for a person who was illiterate

to perform.  As a practical matter, every job in DOT requires at least a level one ability in language;

therefore, an illiterate could not perform any work recommended by a VE.  Clearly Plaintiff, who is not

illiterate, is capable of performing jobs requiring level one language skills and abilities.  Plaintiff failed

to present evidence that would lead to a contrary conclusion.

The reasoning component, by contrast, gauges the minimal ability a worker needs to complete the jobs tasks.  This rung of the reasoning ladder applies to the most elementary of occupations which involve simple and routine work.  The ALJ's only limitation for Plaintiff was that his employer accommodate him by providing an option to sit and stand.  DOT's level two reasoning requirement does not conflict with the ALJ's prescribed limitation.

The ALJ was correct in finding that the application of the classifications did not conflict, citing SSR 00-4p, with the information contained in DOT.

**4. HYPOTHETICAL QUESTIONS.**

Plaintiff provides a list of five functional limitations that the ALJ failed to include in the hypothetical question.  He contends that the hypothetical questions failed to account for the moderate difficulties maintaining social functioning, attention and concentration deficits, the inability to deal with high volumes of stress, limited intellect or the inability to use Plaintiff's hands for prolonged periods.

Under *Varley v. Secretary of Health and Human Services,* 820 F.2d 777, 779 (6th Cir. 1987), "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual physical and mental impairments.' " *Michael v. Astrue,* 2010 W L 2868177, *5 (N. D. Ohio 2010).  "If the hypothetical question does not accurately portray Plaintiff's physical and mental state, the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work." *Id.* (*citing Lancaster v. Commissioner of Social Security,* 2007 WL 1228667, at *9 (6th Cir.2007)).  "However in formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed

25

credible." *Id.* (*citing Gant v. Commissioner of Social Security,* 2010 WL 1378427, at *3 (6th Cir. 2010) (*citing Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-19 ( 6th Cir. 1994 )).

Apparently the ALJ found credible evidence that Plaintiff had moderate difficulties in social functioning.  In the first hypothetical, the ALJ asked the VE to consider moderate difficulties in social functioning (Tr. 804).  The jobs of wire cutter, surveillance system monitor and stock checker jobs would accommodate Plaintiff's need for only brief and occasional interactions with others.  The cafeteria attendant job would be eliminated from the jobs that would accommodate Plaintiff's need for occasional and/or brief interaction with others.

The hypothetical questions are not adequate on the issues of the marked deficiencies in concentration, attention, stress or limited intellect.  Dr. Darr opined that Plaintiff had marked ability to maintain attention and concentration (Tr. 414).  Apparently, the ALJ did take into account Dr. Darr's assessment of Plaintiff's deficiencies in concentration and attention, Mr. Davis' impression that Plaintiff could not deal well with stress and pressures and Plaintiff's contention that he was unable to withstand stress. The ALJ found that Plaintiff had the residual functional capacity to perform light work limited to jobs that were simple and repetitive, reduced to routine tasks with only a few changes in the work place, no fast paced or strict production or jobs in which reading was essential.  Although the ALJ did not inquire of the VE, the findings are reflective of Plaintiff's deficiencies in concentration, attention, stressful situations and intellect.

During cross-examination, Plaintiff inquired of the VE whether the inability to use Plaintiff's hands for prolonged periods would preclude all work.  The VE responded that the surveillance system monitor would not require frequent reaching, handling or fingering (Tr. 810, 811, 812).  The ALJ did consider this proposed limitation as he indicated that Plaintiff was limited to "only frequent handling

and fingering with the bilateral upper extremities" (Tr. 26).

Plaintiff suggests that the ALJ's hypothetical questions did not account for a bipolar disorder with periods of serious dysfunction. There is no psychiatric diagnosis of a mood disorder or documented evidence of episodes of serious dysfunction resulting from the mood disorder. There is evidence that Plaintiff attended three therapeutic interventions designed to assist in stabilizing his moods (Tr. 447, 682, 684). He abandoned most of these scheduled interventions. The ALJ was not required to incorporate this uncorroborated disorder into the hypothetical question.

### 5. TREATING PHYSICIAN.

Plaintiff argues that the ALJ failed to consider Dr. Darr's Mental RFC or advance a reason for rejecting it (Tr. 414).

In social security cases involving a claimant's disability, the Commissioner's regulations require that if the opinion of the claimant's treating physician is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and [is] 'not inconsistent with the other substantial evidence in [the] case record,' " it must be given "controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009) (*citing Wilson, v. Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004) 20 C.F.R. § 404.1527(d)(2)). "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion." *Id.* (*citing Wilson,* 378 F.3d at 544 (quoted with approval in *Bowen v. Commissioner of Social Security,* 478 F.3d 742, 747 (6th Cir. 2007)). Even if the treating physician's opinion is not given controlling weight, "there remains a presumption, albeit a rebuttable one, that the

27

opinion of a treating physician is entitled to great deference." *Id.* (*citing Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007)).

It is uncontradicted that the ALJ gave deference to the Dr. Darr's opinions as they are supported by medically acceptable clinical and diagnostic techniques.  Specifically, the ALJ attributed controlling weight to Dr. Darr's diagnosis and treatment for bilateral carpal tunnel syndrome, status post release surgeries, right elbow ulnar nerve palsy, status post transposition repair surgery, bilateral shoulder, arm, neck and low back pain, spondylosis/degenerative disc disease and bilateral shoulder impingement (Tr. 22; 384-432; 459-468; 673-676).  The ALJ did attribute controlling weight to Dr. Darr's opinions, applying the nature of the treatment relationship, its supportability and Dr. Darr's specialization.  The ALJ gave several valid reasons for discounting the functional capacity assessment prepared by Dr. Darr in March 2005 for the Ohio Department of Job and Family Services because the functional limitations on the report were outside Dr. Darr's area of expertise and it lacked evidentiary support in treatment or diagnostic evidence.  Because the ALJ properly rejected treating source opinions, the Magistrate cannot disturb the resulting conclusions.

**6. PLAINTIFF'S AGE**

Plaintiff argues that the ALJ created a fundamental error when he used his age at the onset of disability.  The ALJ should have used his age as of the date of the decision.

It is well established in the Sixth Circuit that the claimant's age at the time of the decision governs in applying the regulations.  *Varley v. Secretary of Health and Human Services*, 820 F. 2d 777, 780 (6th Cir. 1987).  The ALJ in this case erred by relying on the Plaintiff's age of 41 years at the onset of disability.  At the time the decision was rendered, Plaintiff was 47 years of age.  The Magistrate observes that the ALJ relied on the wrong age in assessing disability; however, Titles 20 C. F. R. §§

28

404.1563 and 416.964, incorporate a younger person who is under 49.  Plaintiff would be considered a younger individual at age 41 or age 47.  Thus, the same rules would apply within the Medical Vocational Guidelines.  According full consideration to these relevant facts, the result would not change whether Plaintiff was 41 or 47 at the time the decision was published.

**CONCLUSION**

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Dated:  January 4, 2011

**<u>NOTICE</u>**

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

29

30